# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

EDWARD CHARLES DUNMORE                                                           PLAINTIFF

V.                               5:08CV00255 BSM/JTR

BRENT COLE, Lieutenant,
Sheridan Detention Center; and
GENTRY DEPRIEST, Officer,
Sheridan Detention Center                                                        DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Brian S. Miller. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3. An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I. Introduction

In September of 2008, Plaintiff Charles Edwards Dunmore ("Plaintiff") was a pretrial detainee in the Sheridan Detention Center ("SDC").[1] On September 12, 2008, he initiated this action by filing a *pro se* Complaint (docket entry #1) asserting three § 1983 claims against various Defendants with whom he had contact during his incarceration in the SDC. All those claims except an excessive force claim were subsequently dismissed.

In Plaintiff's excessive force claim, he alleged that, on September 2, 2008, Defendants Gentry DePriest and Brent Cole used excessive force against him during an incident that took place in A-Pod at the SDC. Defendant DePriest was a jailer and Defendant Cole was the Assistant Chief of Police in Sheridan and the Jail Administrator.

---

[1] He was awaiting trial on felony charges of possession with intent to distribute cocaine.

On December 10, 2009, the Court conducted an evidentiary hearing on the excessive force claim. Before beginning the hearing, Plaintiff, who appeared *pro se*, and Mr. Burt Newell, who represented Defendants, stipulated to the admissibility of Plaintiff's Exhibits 1 through 5 and Defendants' Exhibits 1 though 5. Thus, without objection, the Court received all of those exhibits into evidence.

During the evidentiary hearing, the Court heard testimony from Plaintiff, and two of his witnesses: Mark Lewis ("Lewis") and Jaawwad Ali ("Ali"), both of whom were also prisoners in A-Pod at the time of the September 2 incident.

During Defendants' case-in-chief, the Court heard testimony from Defendants DePriest and Cole, and Sheridan Patrol Officer Everett Wilkerson ("Wilkerson"). Each of these witnesses were also personally involved in various aspects of the September 2 incident.

## II. Findings of Fact

**A. Background**

1. The SDC has six "pods," which are designated A through F. Each of the pods has a common area or day room with two cells at the rear, a shower, and a commode. The cells each contain one set of bunk beds. Another set of bunk beds are located at each end of the day room. When more than eight prisoners are housed in a pod, additional mattresses are placed on the floor. Each pod has been approved to house up to ten prisoners. The cells at the rear of each pod are equipped with doors that lock automatically when they are closed.

2. Entry into each pod is through a solid-steel door that has a two and a half foot plexiglass window. This window allows jailers to see inside the pod. The door also has a slot that is approximately six by eighteen inches. The slot can be closed from the outside by a trap door.

Jailers use this slot to pass food trays to prisoners. After meals are finished, jailers return and open the slot to receive the empty food trays. Both the jailers and the prisoners in the SDC commonly refer to this slot as the "bean hole."

3. On September 2, 2008, A-Pod was used to house prisoners who were charged with or had already been convicted of felonies. On the morning of September 2, there were nine prisoners in A-Pod: Plaintiff; Lewis; Ali; Charles White ("White"); Justin Murdock ("Murdock"); Charles Neal; Jarrell Smith; Larry Edwards; and Quentin Webb ("Webb"). In August of 2009, Plaintiff had gotten into a fight in A-Pod with Glen Oxley, a fellow prisoner. About the same time, White had attacked Officer Wilkerson, after he told White that it was time for White to leave the recreation yard. According to the testimony of Lewis and Ali, White was always running around A-Pod and getting into trouble. Lewis also testified that, when Webb was not getting his medication, he could become argumentative and belligerent. Thus, at the time of the September 2 incident, Defendant DePriest and Defendant Cole knew that A-Pod housed felony offenders and that some of those prisoners had a history of violence in the SDC.

4. On September 2, 2008, Defendant DePriest worked a twelve-hour shift that began at 7:00 a.m. and ended at 7:00 p.m. He was the only jailer assigned to pods A through F, and he was responsible for supervising all six pods. Approximately forty to fifty prisoners were in the SDC on September 2, 2008. The only other SDC employee assigned full time to the facility during Defendant DePriest's shift was a woman who answered the phone "up front in the administrative area."

5. At 8:00 p.m. on September 2, 2008, less than two hours after the alleged excessive-force incident in A-Pod, Defendant DePriest wrote a detailed five-page report describing what had

4

taken place before, during, and after the September 2 incident. (*See* DX#2.) The Court finds Defendant DePriest's incident report to be credible and to represent an accurate account of what happened on September 2.

6. Defendant DePriest had worked as a jailer at the SDC for about eighteen months before the September 2, 2008 incident. On December 31, 2008, he left his employment at the SDC to become an apprentice electrician. Since the September 2 incident, Defendant Cole has continued to serve as the Assistant Chief of Police in Sheridan and the Jail Administrator for the SDC.

**B.    The September 2, 2008 Incident**

7. At approximately 4:45 p.m., Defendant DePriest gave the prisoners in A-Pod their food trays. (*See* DX#2 at p.2.) At 5:18 p.m., Defendant DePriest heard Webb yelling at him and ask Webb "what is your problem?" Webb responded: "since you have not gave us cleaning supplies today you will not get your [food] trays back."[2] (*Id.*) Defendant DePriest looked through the A-Pod window and "noticed that the trays were not in the bean hole." (*Id.*)

8. Defendant DePriest gave a direct order for someone in A-Pod to pass the food trays through the bean hole. No one in A-Pod obeyed this order. Based on Webb's confrontational statement, Defendant DePriest ordered him to the door so that he could be removed from A-Pod and placed in a holding cell. On his way to the door, Webb told Defendant DePriest "we are all banning together, you are not getting the [food] trays." (*Id.* at. p.3.)

---

[2]According to Defendant DePriest's incident report, this was not the first time he had exchanged words with Webb that day. At 7:00 a.m., Defendant DePriest's conversation with another prisoner in A-Pod awakened Webb. He complained about having been disturbed from his sleep and told Defendant DePriest: "I am tired of all this petty bullshit . . . ." (*See* DX#2 at p.1.) As a result of this exchange, Defendant DePriest removed Webb from A-Pod and placed him in a one-man holding cell. Several hours later, Webb was returned to A-Pod.

9. In their testimony, Plaintiff, Lewis, and Ali *admitted* that, because A-Pod had not received cleaning supplies on September 2, Webb had urged all of the prisoners in A-Pod to "band together" and not give Defendant DePriest their food trays until he gave them cleaning supplies. They also acknowledged that all of the prisoners in A-Pod agreed to "ban together" to implement this plan. When Defendant DePriest removed Webb from A-Pod for being confrontational about the return of the food trays, Plaintiff testified that this made him angry.

10. Plaintiff, Lewis, and Ali all testified that they knew their refusal to return the food trays would be construed as an act of defiance and that all of the prisoners in A-Pod would be punished. In their minds, however, the "appropriate" punishment would have been the loss of television, phone, commissary, and visitation privileges. All of them testified that they did *not* believe their unified act of defiance justified the use of pepper spray, and they all indicated they were "surprised" when Defendant Cole subsequently used it. However, Lewis admitted that, after all of the prisoners in A-Pod refused to obey Defendant DePriest's orders to return the food trays, he decided it would be a good idea to move from the common area to his bunk in one of the interior cells to get as far away as possible from the door.

11. According to Defendant DePriest's incident report, at approximately 5:20 p.m., he returned to A-Pod and "opened the door and gave the other eight inmates . . . a direct order for one of them to come pick the trays up and hand them to me. No inmate complied with my order." (*Id.*) At the time he gave this second order to return the food trays, he could see that they were scattered on the floor, near the door. Defendant DePriest explained that SDC regulations prohibited a lone jailer from entering a pod. If he had entered A-Pod to retrieve the food trays he would have violated this regulation and he believed that it also would have jeopardized his personal safety. He knew

from Webb's earlier confrontational statement that all of the A-Pod prisoners were acting in concert to defy his orders to return the food trays. He was concerned that, if he entered A-Pod and bent over to pick up the trays, he would be kicked and attacked by some or all of the prisoners in A-Pod. Given the open defiance displayed by the prisoners in A-Pod, the Court finds that Defendant DePriest's concerns were justified.

12. At 5:30 p.m., Defendant DePriest called Defendant Cole on his cell phone and explained to him that all of the inmates in A-Pod had "banned together" and were refusing to comply with his repeated orders to surrender their food trays. Defendant Cole immediately left home and went to the SDC.

13. At the time of the September 2 incident, Defendant DePriest was in his mid-twenties. He was a young and relatively inexperienced full-time jailer and he was not a trained law enforcement officer. Many of the prisoners in A-Pod were older than him and more physically imposing. In contrast, Defendant Cole was in his mid-forties and was a career law enforcement officer. He was Sheridan's Assistant Chief of Police and the Jail Administrator, which made him the senior person in charge of the SDC.

14. According to Defendant DePriest's incident report, he and Defendant Cole arrived at A-Pod at "approximately 5:45 p.m." (*See* DX#2 at p.3). With Defendant Cole now involved, this was no longer a petty dispute between a young jailer and a group of older and more experienced prisoners. Defendant Cole testified that he issued two or three direct orders to the prisoners in A-Pod to return their food trays. Defendant Cole admitted he used some profanity in issuing these orders. Plaintiff, Murdock, White, and Ali were seated at a table, directly in front of the door, playing cards. Lewis and two other prisoners were in the bunks in the two interior cells. Defendant

Cole could see another prisoner taking a shower. According to Defendant Cole, when he ordered the prisoners to pass their food trays through the bean hole, Plaintiff turned, looked at Defendant Cole, and smiled. None of the prisoners in A-Pod responded to any of Defendant Cole's orders. Defendant DePriest's testimony and his incident report are consistent with Defendant Cole's testimony on these points.

15. According to Defendant Cole, when prisoners "ban together" to defy repeated direct orders from jail personnel, it creates a dangerous situation. In his opinion, the level of this danger is only one step below a riot. He stated that this unified conduct by all of the prisoners in A-Pod directly threatened "institutional control" at the SDC. Defendant Cole also testified that, given the behavior of the prisoners in A-Pod, he was concerned that, if he and Defendant DePriest entered the common area to retrieve the food trays, they might be attacked. Defendant Cole testified that: (a) all of the prisoners in A-Pod were felony offenders; (b) White had recently been involved in a fight with Officer Wilkerson in the recreational yard; and (c) Plaintiff had been in a fight with another prisoner in A-Pod the previous month.

16. Defendant Cole and Defendant DePriest testified that they left A-Pod and went back to Defendant Cole's office. Defendant Cole radioed Sheridan's only police officers on duty, Wilkerson and Officer Wicker ("Wicker"). He ordered both of them to report immediately to the SDC. Wilkerson arrived at the ADC before Wicker.

17. There were two twelve-ounce cans of pepper spray in Defendant Cole's office. Wilkerson testified that had used one of these cans several weeks earlier to spray a dangerous dog. According to Defendant Cole, another patrol officer had used the same can later to spray an arrestee. Both Defendant Cole and Wilkerson testified that this can was less than half full. The second

8

pepper-spray can was full and had never been used.

18. As soon as Wilkerson arrived, Defendant Cole took the partially used can of pepper spray, handed the full can of pepper spray to Defendant DePriest, and all three officers walked back to A-Pod.

19. According to Defendant Cole, when he got to A-Pod, he held the can of pepper spray up to the window and shouted at the prisoners to get in the two interior cells and lock the doors. If the prisoners had complied with this order, Defendant Cole testified he and the other officers would have entered A-Pod and removed the food trays.[3] He repeated this order two or three times. Plaintiff, Ali, Murdock, and White, all of whom were seated at the table in front of the door, did not move. The Court finds that Plaintiff and the other prisoners seated at the table heard Defendant Cole's orders to go inside the cells and lock the doors but chose to defy those orders.

20. Defendant Cole testified that he then told the four prisoners seated at the table that, if they did not get inside the two interior cells and lock the doors, he was going to "pepper spray their asses." Wilkerson testified that, while he was not "100% sure," he believed Defendant Cole warned the prisoners in A-Pod before he used the pepper spray. Plaintiff, Ali, and Lewis all testified that Defendant Cole did *not* issue any warning before he used the pepper spray.

21. On September 3, 2008, Defendant Cole and Wilkerson both prepared independent "incident reports." These incident reports are similar and both recite the multiple orders that Defendant Cole gave to the prisoners in A-Pod: first, to return their food trays; and then, later, to get inside the two interior cells and lock the doors. (*See* DX#3 and #4.) However, neither of these

---

[3]Defendant Cole testified that he yelled these orders so loud that the prisoners in C-Pod heard him and, thinking he was talking to them, got inside the two cells in C-Pod and locked the doors.

incident reports reflect that Defendant Cole gave the prisoners in A-Pod any warning before he used the pepper spray. Both Defendant Cole and Wilkerson admitted their incident reports should have mentioned those warnings. They both explained this "oversight" as a "mistake."

22. Defendant DePriest's much more detailed incident report, which was prepared less than two hours after the incident, does *not* mention anything about Defendant Cole issuing a warning before he used the pepper spray. Defendant DePriest testified that he did *not* recall Defendant Cole issuing such a warning before he used the pepper spray.

23. Plaintiff and his witnesses all testified that they heard Defendant DePriest and, later, Defendant Cole, repeatedly order them to pass their food trays through the bean hole. They also admitted that neither they nor anyone else in A-Pod took any action to comply with those direct orders. However, all three testified that they did *not* recall Defendant Cole: (a) later order them to go inside the interior cells and lock the doors; or (b) issue any warning before he used the pepper spray. According to them, after they refused to comply with the repeated orders of Defendants DePriest and Cole to return the food trays, Defendant Cole suddenly and unexpectedly fired the entire contents of two twenty-four ounce cans of pepper spray into A-Pod.

24. The Court credits Defendant DePriest's detailed incident report, which does not mention Defendant Cole issuing any warning before he used the pepper spray, and Defendant DePriest's testimony that he did not recall Defendant Cole giving such a warning. The Court also finds it telling that, in their own incident reports, neither Defendant Cole nor Wilkerson mentioned anything about Defendant Cole giving such a warning.

25. Plaintiff admitted that he never saw the cans of pepper spray used by Defendant Cole and Defendant DePriest. He testified that another prisoner told him the cans contained twenty-four

ounces of pepper spray. The Court rejects Plaintiff's hearsay testimony that two twenty-four ounce cans of pepper spray were used in the September 2 incident. The Court finds that Defendant Cole used a less than half-full twelve-ounce can of pepper spray and that Defendant DePriest carried and attempted to spray a burst from a full twelve-ounce can of pepper spray.

26. The Court finds that Defendant DePriest and Defendant Cole issued repeated orders for Plaintiff and the other A-Pod prisoners to return their food trays. When those orders were disobeyed, Defendants Cole and DePriest went to Defendant Cole's office, picked up two cans of pepper spray, and all returned to A-Pod with Wilkerson.

27. The Court rejects the testimony of Plaintiff and his witnesses that Defendant Cole did not issue at least two orders for the A-Pod prisoners to go inside the two interior cells and lock the doors. The Court finds that Plaintiff, the three other prisoners seated at the table, and the prisoner in the shower ignored those orders.

28. The facts are undisputed that all of the prisoners in A-Pod had "banned together," initially to defy repeated orders to return their food trays, and then to defy repeated orders to go inside the two interior cells and lock the doors. By engaging in this conduct, these prisoners were, in effect, seizing control of A-Pod. All of these prisoner were felony offenders and at least two of them had been involved in violent incidents since they had been incarcerated in the SDC. By the time Defendant Cole, the Jail Administrator, became involved in the September 2 incident, it had escalated from a seemingly trivial dispute over returning food trays into a serious and potentially dangerous confrontation between prisoners and outnumbered jailers.

29. Defendants DePriest and Cole testified that the food trays were made of hard plastic and weighed approximately eight to ten ounces. If swung as a weapon, Defendant DePriest testified

11

a tray could knock out a person and the edge of the tray would break the skin or scalp. If a tray was broken into shards, Defendant DePriest testified they could be used as shanks. Thus, when Plaintiff and the other prisoners refused to surrender these trays and return to the cells and lock the doors, it became imperative for Defendant Cole to regain control over A-Pod and remove the trays.

30. When Defendant Cole issued his orders for all prisoners in A-Pod to go inside the two interior cells and lock the doors, Plaintiff and the other prisoners in A-Pod knew the purpose for these orders: It would allow the jailers to safely enter the common area and remove the food trays. By repeatedly defying these orders and remaining in the common area, Plaintiff and the other prisoners were signaling to Defendant Cole that they did not intend to allow jailers to enter A-Pod without risking a physical altercation of some kind.

31. When Wicker arrived outside A-Pod, the prisoners in A-Pod outnumbered the jailers by two to one. Given the dangerous nature of this confrontation, the Court finds that Defendant Cole was justified in using pepper spray, without first warning Plaintiff and the other prisoners of what he intended to do. Defendant Cole was faced with recalcitrant prisoners, who were openly defying repeated orders that were aimed at allowing the jailers to safely enter A-Pod. If he had issued such a warning, some of the prisoners might have attempted to block the bean hole to thwart the use of pepper spray or used clothing or sheets to protect themselves from the affects of the pepper spray and be in a better condition to attack the jailers when they entered the cell. Thus, issuing such a warning would have only heightened the danger faced by the officers in restoring institutional control.[4]

---

[4] In making this finding, the Court notes that the SDC is a small town jail and has neither the resources nor the personnel to hire, outfit, and train "extraction teams" that are commonly used to handle such situations in large state and federal prisons. If an extraction team had been confronted with these same facts, those officers (equipped with breathing equipment and protective clothing) almost certainly would have had a duty to warn the prisoners before using pepper spray.

32. The Court has carefully read and considered the line of Eighth Circuit cases holding that a corrections officer, under certain circumstances, has a duty to warn a prisoner before using pepper spray. *See Walker v. Bowersox*, 526 F.3d 1186 (8th Cir. 2008); *Treats v. Morgan,* 308 F.3d 868 (8th Cir. 2002); *Foulk v. Charrier,* 262 F.3d 687 (8th Cir. 2001); *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000). However, the facts in those cases are much different from those involved in this action. Given the facts in this case, the Court concludes that Defendant Cole was *not* required to warn Plaintiff and the other prisoners in A-Pod before he used the pepper spray.

33. Defendants Cole and DePriest and Wilkerson testified that Defendant Cole used the less than half-full twelve-ounce can of pepper spray to fire a two-second burst through the bean hole. All of the witnesses, including Plaintiff, Lewis, and Ali, agree that the initial burst of pepper spray hit the far wall. This strongly suggests that Defendant Cole was not trying to hit Plaintiff or any of the other prisoners seated at the table. According to Defendant Cole, after he sprayed this initial burst, all four prisoners remained seated at the table. Defendant Cole then sprayed another two-second burst. While it is unclear where this burst went, it is undisputed that none of the prisoners in A-Pod were hit. According to Defendant Cole, after he sprayed the second burst, some of the prisoners started getting up from the table, but they did not appear to be moving toward the two interior cells.

34. Because Defendant Cole's can of pepper spray was now empty, he ordered Defendant DePriest to use his can to fire a third burst through the bean hole. Defendant DePriest's aim was poor. The burst of spray hit the side of the bean hole and deflected back on him and, to a lesser extent, Defendant Cole. It does not appear that much, if any, of this burst entered A-Pod. Defendant DePriest immediately left A-Pod and went to the showers to decontaminate himself.

35. While none of the prisoners in A-Pod were hit directly by the two bursts of pepper spray fired by Defendant Cole, they all suffered respiratory discomfort from inhaling the pepper spray and having it drift onto their exposed skin. Plaintiff testified that the pepper spray caused his eyes and nose to burn and run and made him feel nauseated. Lewis and Ali testified to similar problems but neither of them experienced any nausea.

36. After Defendant DePriest misfired the third burst of pepper spray, all of the prisoners went inside the two interior cells, and Defendant Cole and Wilkerson entered and handcuffed the prisoners. They were immediately escorted to the recreation yard, where Defendant Cole used a garden hose to decontaminate each prisoner. All of the prisoners, expect Plaintiff, allowed Defendant Cole to use the garden hose to decontaminate them. Because Plaintiff was angry, he testified that he refused to allow Defendant Cole to decontaminate him.

37. Defendant Cole and Wilkerson then took Plaintiff and the other prisoners into the shower room and allowed them to take a shower and change into clean clothes. Afterwards, Defendant DePriest moved the A-Pod prisoners into the visitation room while Defendant Cole and Wilkerson went back to decontaminate A-Pod. They mopped the floor and cleaned the walls, removed all of the sheets on the bunks, and replaced them with clean sheets. At approximately 6:30 p.m., Plaintiff and the other prisoners were returned to A-Pod. Plaintiff, Lewis, and Ali all testified that, when they returned to A-Pod, it had been cleaned and decontaminated, and clean sheets had been placed on the bunks.

38. Based on these largely undisputed facts, the Court finds that Defendant DePriest did not use any force, excessive or otherwise, against Plaintiff. While he did *attempt* to use force, his badly aimed burst of pepper spray deflected into his own face and also hit Defendant Cole.

39. The Court finds that Defendant Cole fired two bursts of pepper spray into A-Pod, but neither Plaintiff nor any of the other prisoners suffered a direct hit. There is simply no evidence to support Plaintiff's allegation that Defendant Cole emptied the contents of two twenty-four ounce cans of pepper spray into A-Pod. While the indirect exposure to the pepper spray made Plaintiff feel nauseated and caused his eyes and nose to run, and his skin to burn, his discomfort was not sufficient to overcome his anger and accept the water Defendant Cole offered him in the recreation yard immediately after the incident. Plaintiff admitted that a short time later he did take a shower and change into clean clothes.

40. Defendant Cole was confronted with eight recalcitrant and defiant prisoners who were acting in concert to defy his orders. Those prisoners had access to food trays which could have been used as weapons. Defendant Cole had only three other officers at his disposal to try to restore order in A-Pod. Under these circumstances, the Court finds that Defendant Cole's decision to use pepper spray, without first giving a warning, was a measured and reasonable response to a dangerous situation, that posed a serious threat to the safety of the officers and to overall institutional control of the facility.

41. Finally, during the evidentiary hearing, Plaintiff testified that he believed the Defendants' use of pepper spray violated the policies and regulations of the SDC. Plaintiff introduced those polices and regulations into evidence as PLX1, PLX2, and PLX3. After carefully reviewing those documents the Court finds that the Defendant Cole's use of pepper spray in the September 2 incident did not violate any policies or regulations.

42. In PLX2, Section B(2)(a) and (c), jailers are authorized to use "non-deadly force" to "protect themselves" and "to bring an unlawful situation safely and effectively under control."

Section C(2) defines "OC [Oleoresin Capsicum] pepper spray" as one form of non-deadly force and specifies that it can be used if there is a reasonably apparent danger of a physical injury to an officer and the officer is "unable to verbally control the offender." PLX3 specifically deals with the procedures for using OC pepper spray. Subsection (c) and (d) make it clear that: (1) an officer is permitted to use pepper spray when confronted by a prisoner who is "presenting a definite danger to himself or others;" and (2) the pepper spray should be used "to terminate violent behavior or the threat of violent behavior which could result in injury to the officers or others . . . ." The Court finds that Defendant Cole's use of pepper spray during the September 2 incident was justified under the SDC's general policies governing the use of non-deadly force and its specific regulations governing the use of chemical agents.

### III. Conclusions of Law

43. Before analyzing a prisoner's § 1983 excessive force claim, the Court must determine the prisoner's status at the time the force was used, *i.e.*, was he an arrestee, a pretrial detainee, or a convicted prisoner. *See Graham v. Connor*, 490 U.S. 386, 393 (1989); *Andrews v. Neer*, 253 F.3d 1052, 1060-61 (8th Cir. 2001); 8th Cir. Model Jury Inst. 4.10, 4.20, and 4.30. Plaintiff and Defendants' counsel stipulated that, at the time of the September 2, 2008 incident, Plaintiff was a pretrial detainee in the SDC.

44. The Eighth Circuit has made it clear that an excessive force claim brought by a pretrial detainee must be analyzed under the due process clause of the Fourteenth Amendment. *See Andrews,* 253 F.3d at 1060-61; *Johnson-El v. Schemehl*; 878 F.2d 1043, 1048-49 (8th Cir. 1989). When evaluating such a claim by a pretrial detainee, the fact finder should consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the

16

amount of force used; (3) the extent of the injury; (4) whether, subjectively, the officer used force to punish or to achieve a legitimate purpose; and (5) whether, objectively, a reasonable officer on the scene would have used the same force. *See Andrews*, 253 F.3d at 1061 n.7 (*citing* 8th Cir. Model Jury Inst. 4.20 with approval).

45. Based on the foregoing findings of fact, the Court concludes that: (1) the use of force by Defendant Cole was reasonably necessary to restore order and maintain institutional control over A-Pod; (2) the amount of force used by Defendant Cole was proportionate to the need justifying the use of force; (3) Plaintiff did not suffer a direct hit from the pepper spray and the injuries he suffered were limited to secondary exposure to the aerosolized spray; (4) Defendant Cole used the pepper spray for the legitimate purpose of restoring order and regaining institutional control over A-Pod; and (5) under the same circumstances, any reasonable jailer or law enforcement officer would have used similar force. Accordingly, Plaintiff has failed to prove, by a preponderance of the evidence, that Defendants DePriest and Cole used excessive force against him during the September 2, 2008 incident.

IT IS THEREFORE RECOMMENDED that the Court adopt this Proposed Decision and that Judgment be entered in favor of Defendants.

Dated this 17th day of December, 2009.

_____
UNITED STATES MAGISTRATE JUDGE